United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRANDON BANKS, et al.,

    Plaintiffs,

    v.

NISSAN NORTH AMERICA, INC., et al.,

    Defendants.
_____/

No. C 11-2022 PJH

**ORDER GRANTING MOTION FOR CLASS CERTIFICATION; GRANTING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT; GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL**

Plaintiff's motion for class certification and motion for leave to file a fourth amended class action complaint came on for hearing before this court on October 30, 2013. Plaintiffs Brandon Banks, Erin Banks, and David Soloway ("plaintiffs") appeared through their counsel, Kirk Wolden, Michael Ram, and Ryan Lutz. Defendant Nissan North America, Inc. ("Nissan" or "defendant") appeared through its counsel, G. Charles Nierlich. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS plaintiffs' motion for leave to file a fourth amended class action complaint, for the reasons stated at the hearing, and GRANTS plaintiffs' motion for class certification as follows.

## BACKGROUND

This is a products liability class action involving Nissan vehicles. Plaintiffs Brandon Banks, Erin Banks, and David Soloway ("plaintiffs") filed suit against defendant Nissan North America, Inc. ("Nissan" or "NNA") as a result of problems that they experienced with the Delta Stroke Sensor, a brake component of their Nissan vehicles. Plaintiffs seek

certification of the following class[1]:

> All consumer residents in California who own 2004-2008 Nissan Armada, Titan (equipped with VDC), and Infiniti QX56 vehicles manufactured before April 1, 2008 ("Affected Vehicles") and all consumer residents in California who do not presently own Affected Vehicles but incurred monetary loss caused by the failure of the Delta Stroke Sensor in their Affected Vehicles. This definition specifically excludes any and all persons who assert personal injury claims arising from or relating to the failure of the Delta Stroke Sensor in their Affected Vehicles.

In October 2006, the Banks plaintiffs purchased a used 2004 Nissan Armada vehicle. See Third Amended Class Action Complaint ("TAC"), ¶ 12. At the time of purchase, the vehicle had approximately 23,000 miles of use recorded on the odometer. Plaintiffs purchased an extended 75,000 mile warranty on the vehicle. See id. Sometime in 2010[2], plaintiff Erin Banks was driving the vehicle, and as she approached an intersection at approximately 40 miles per hour with her two children in the back seat, she began to apply the brakes in order to stop at a red light in the intersection, but was unable to slow down. She repeatedly attempted to apply and/or pump the brakes without success, which resulted in her coasting through the intersection against the red light at approximately 40 miles per hour. See TAC, ¶ 13.

After three similar incidents of brake failure occurred, the Bankses took their vehicle to the dealer, Future Nissan in Roseville, CA. Future Nissan inspected the Banks' vehicle, and Brandon Banks was subsequently contacted by a service department representative who advised him that the vehicle had displayed a Diagnostic Test Code C1179, which purportedly correlated to the ABS control unit code for the Delta Stroke Sensor. TAC, ¶ 14. The Delta Stroke Sensor is an electronic component of the vehicle that interfaces with the

---

[1] This class definition, from the motion for class certification, is different than the definition in the Third Amended Complaint ("TAC"). Plaintiffs sought leave to amend the complaint in order to bring the complaint's class definition in line with the motion for class certification, and that motion was granted at the October 30, 2013 hearing.

[2] The complaint alleges that this incident occurred on or about February 24, 2011, but the motion for class certification states that this incident occurred in 2010, and that three similar incidents occurred between then and February 2011. Compare TAC, ¶ 13 with Dkt. 109 at 11.

2

Electronic Control Unit ("ECU") on the vehicle. TAC, ¶ 24A. When the Delta Stroke Sensor fails, the electronic computer system in affected vehicles puts out diagnostic error code C1179. TAC, ¶ 24E.

By way of background, plaintiffs allege that the Delta Stroke Sensor measures the application of manual driver pressure to the brake pedal, by converting the movement of the brake pedal into an electrical signal that is then communicated to the ECU. Id., ¶ 24C. The ECU provides information to the ABS system, which determines how much vacuum pressure to apply to the power assist for each wheel's brake. Id., ¶ 2DD. As such, the failure of the ABS system to accurately identify or determine the amount of power assist to deliver to each of the brakes, materially and adversely affects the braking power available to the affected wheel. Id.

Delta Stroke Sensor failures cause the device to erroneously report information to the ECU, which means that the ABS does not receive the information necessary to assess and apply power assist to the individual brakes. Plaintiffs allege that this malfunction results in the loss of approximately 60% of braking power. TAC, ¶¶ 24E-F; Dkt. 109 at 4.

When the Banks' Nissan was diagnosed with the error code C1179, plaintiffs allege that the Future Nissan service representative further informed Mr. Banks that he had seen this failure on other occasions and that Nissan had issued an update relating to the problem, but that even after the update, vehicles would still experience Delta Stroke Sensor failures. TAC, ¶ 14. The service representative then told Mr. Banks that the only way to fix the problem was to replace the Delta Stroke Sensor at a price in excess of $1000. See id. Mr. Banks requested that Future Nissan cover the replacement of the Delta Stroke Sensor, but the dealership declined, telling him to take the issue up with Nissan.

On February 25, 2011, Mr. Banks contacted Pauline Reed at Nissan Consumer Affairs. Nissan responded on March 1, 2011, when Nissan regional specialist Cory Heinz contacted Mr. Banks in order to discuss the problem. See TAC, ¶¶ 15-16.

On March 4, 2011, Mr. Banks placed a follow-up call to Ms. Heinz, who informed Mr. Banks that he needed to bring his vehicle in for a second formal diagnosis at Future

3

Nissan. Mr. Banks did so, and on March 7, he received a call from Future Nissan informing him that the dealership was waiting on Nissan to make a decision. TAC, ¶¶ 17-18.

On March 8, 2011, Ms. Heinz contacted Mr. Banks and informed him that Nissan had made the decision to deny coverage for the cost of replacing and repairing the Delta Stroke Sensor. Ms. Heinz indicated that the decision was based on various factors, including that plaintiffs' warranty had allegedly expired. See id., ¶ 19. Ms. Heinz allegedly also told Mr. Banks that the decision was ultimately a business decision, and took account of the fact that the Bankses had a lack of history of brand loyalty. Id.

As a result of Nissan's denial, the Banks plaintiffs allege they were forced to pay a final cost of $967.13, which plaintiffs paid to Future Nissan. See TAC, ¶ 19. The Bankses ultimately sold the vehicle because of their dangerous experiences with brake failure.

Plaintiff Soloway purchased a new Infiniti QX56 from Tustin Infiniti around June 2006. TAC, ¶ 20. Around August 2011, plaintiff Soloway's brother-in-law, Ryan Rivera, drove Soloway's wife and son to a basketball game when the brakes failed. Specifically, as the car approached a red light, Mr. Rivera pressed the brakes to stop the vehicle, but the brakes failed to stop the vehicle, and the car ran through a red light. Mr. Rivera was forced to use the emergency brake to stop the vehicle after running through the red light. TAC, ¶ 21. Soloway's vehicle was towed to Lavco Automotive, and a diagnostic inspection revealed error code C1179. Soloway called Tustin Infiniti, and a service representative told him that he had seen this failure before, but that the vehicle was out of warranty and the repair would cost approximately $1,000. TAC, ¶ 22. As a result, Soloway was forced to replace the Delta Stroke Sensor at a cost of $618.84. Plaintiff Soloway sold his vehicle as a result of the brake failures.

Plaintiffs allege that Nissan was aware of the Delta Stroke Sensor ("DSS") safety defect by 2004. Specifically, plaintiffs point to a December 12, 2003 "concern and counter-measure request" noting that all Nissan models were affected by a "bad Delta S-Sensor." Dkt. 109 at 5. Plaintiffs also point out that, in the last 30 days of 2004, Nissan received 50 warranty claims of DSS failure on one model (the Armada) of Affected Vehicles. Id.

4

Plaintiffs also allege that, during 2004 and 2005, Nissan held engineering meetings to discuss DSS failures. Dkt. 109 at 6.

Plaintiffs further note that, between 2004 and 2011, Nissan received more than 300 complaints from the National Highway Traffic Safety Administration ("NHTSA") regarding sudden and substantial loss of braking power consistent with DSS failure. Dkt. 109 at 7. At least 38 of these reports were received before 2006, and 72 of them were received before 2007. These reports include instances of wrecks, injuries, and death. At least 20 of these 300 complaints specifically mentioned either "Delta Stroke Sensor" or error code "1179." In 2005, Nissan conducted an investigation called the "Phoenix Scramble," where it identified six vehicles with error code 1179 and collected their brake boosters for further testing, which confirmed that the Delta Stroke Sensor caused the error. Dkt. 109 at 8.

Plaintiffs allege that Nissan issued a Technical Service Bulletin NTB06-040 ("TSB") on May 12, 2006, which recommended a software reprogramming to fix the DSS error. In the TSB, Nissan describes the failure as "vibration in the brake pedal while braking," while plaintiffs argue that the TSB fails to describe the safety defect truthfully. Plaintiffs allege that Nissan knew that the software fix would be ineffective, and that a replacement of the brake booster was necessary to fix the error. In fact, starting in April 2008, Nissan did redesign the brake booster, and warranty claims have fallen from over 10% to nearly zero. But, importantly, Nissan has not updated or modified the TSB. Plaintiffs claim that the evidence confirms Nissan's intent to conceal the true nature of the safety defect by promoting a faulty fix to a real hazard.

Plaintiffs assert two causes of action against Nissan: (1) a claim for unfair business practices under Cal. Bus. & Prof. Code § 17200; and (2) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civil Code § 1750 et seq. Plaintiffs now move for class certification as to both causes of action.

**DISCUSSION**

A.  Legal Standard

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to

determine whether the party seeking certification has met the prerequisites of Rule 23." Mazza v. American Honda Motor Co., Inc., 666 F.3d 581, 588 (9th Cir. 2012) (citation and quotation omitted).

The party seeking class certification bears the burden of affirmatively demonstrating that the class meets the requirements of Federal Rule of Civil Procedure 23. Wal-Mart Stores, Inc. v. Dukes, __ U.S. __, 131 S.Ct. 2541, 2551 (2011). In order for a class action to be certified, plaintiffs must prove that they meet the requirements of Federal Rule of Civil Procedure 23(a) and (b).

Rule 23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality and adequacy of representation in order to maintain a class. First, the class must be so numerous that joinder of all members individually is "impracticable." See Fed. R. Civ. P. 23(a)(1). Second, there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Third, the claims or defenses of the class representative must be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). And fourth, the class representative(s) must be able to protect fairly and adequately the interests of all members of the class. Fed. R. Civ. P. 23(a)(4). The parties moving for class certification bear the burden of establishing that the Rule 23(a) requirements are satisfied. Gen'l Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982); see also Dukes, 131 S.Ct. at 2551.

If all four prerequisites of Rule 23(a) are satisfied, the court then determines whether to certify the class under one of the three subsections of Rule 23(b), pursuant to which the named plaintiffs must establish that either 1) that there is a risk of substantial prejudice from separate actions; or 2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or 3) that common questions of law or fact common to the class predominate and that a class action is superior to other methods available for adjudicating the controversy at issue. See Fed. R. Civ. P. 23(b)(3).

The court does not make a preliminary inquiry into the merits of plaintiffs' claims in determining whether to certify a class. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974). The court will, however, scrutinize plaintiffs' legal causes of action to determine

whether they are suitable for resolution on a class-wide basis. See, e.g., Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983). Making such a determination will sometimes require examining issues that overlap with the merits. See Dukes, 131 S.Ct. at 2551-52 (acknowledging that court's "rigorous analysis" will frequently entail some overlap with merits of plaintiff's underlying claim).

B.   Legal Analysis

   1.   Numerosity

Plaintiffs allege that Nissan sold over 63,000 Affected Vehicles, and defendant does not challenge this figure. Thus, the court finds that the numerosity requirement is met in this case.

   2.   Commonality

Plaintiffs provide a list of issues that they believe are common to the class: (1) whether the DSS is a safety device, (2) whether the DSS is defective in its design, (3) whether Nissan knew of the DSS defect, (4) whether Nissan had a duty to disclose its knowledge, (5) whether Nissan failed to disclose its knowledge, (6) whether Nissan's concealment has injured plaintiffs and the class, (7) whether the failure to disclose the DSS defect is likely to mislead a reasonable consumer, (8) whether the failure to disclose the DSS defect is likely to mislead an ordinary consumer acting reasonably under the circumstances, (9) whether the design defect that Nissan failed to disclose was material to the reasonable consumer, (10) whether the alleged failure to disclose violated the CLRA, (11) whether Nissan's violation of the CLRA is a violation of the UCL's "unlawful" prong, (12) whether Nissan's failure to disclose the DSS defect is an unfair business practice, (13) whether Nissan's failure to disclose the DSS defect is a fraudulent business practice, and (14) whether Nissan failed to disclose a material safety defect in Affected Vehicles. Plaintiffs also argue that the cost of repair and damages for each class member can be determined on a common basis.

While the court need not address all of plaintiff's alleged common issues individually, it does note that this case presents many of the same issues as two recent Ninth Circuit

7

cases. See Chamberlan v. Ford, 402 F.3d 952 (9th Cir. 2005) (affirming grant of class certification); Wolin v. Jaguar Land Rover, 617 F.3d 1168 (9th Cir. 2010) (reversing denial of class certification).

Chamberlan involved allegations that Ford manufactured, sold, and distributed vehicles containing defective engine intake manifolds. Because the manifolds were made of plastic, they were susceptible to cracking. Ford redesigned the plastic manifolds multiple times, but these redesigns were ineffective. Only when Ford replaced the plastic parts with aluminum parts did the cracking problem stop. Plaintiffs asserted a CLRA claim on behalf of current owners, and former owners who paid to repair or replace the part. Like this case, the putative class in Chamberlan excluded class members who suffered personal injuries stemming from the plastic parts. The district court granted class certification in a relatively short order, finding that Rule 23's requirements were met. Ford sought interlocutory appeal, arguing (among other things) that the commonality requirement was not met, because "the facts pertaining to the causes of action differ depending on which vehicle the claimaint owns, when that vehicle was produced, and what each individual buyer's expectations were regarding the durability of the intake manifold of the vehicle." Ford argued that these claimant-specific issues predominated over any common issues. The Ninth Circuit disagreed, finding that "although the district court was succinct, it provided detailed, substantive examples of the common issues: (1) whether the design of the plastic intake manifold was defective; (2) whether Ford was aware of alleged design defects; (3) whether Ford had a duty to disclose its knowledge; (4) whether it failed to do so; (5) whether the facts that Ford allegedly failed to disclose were material; and (6) whether the alleged failure to disclose violated the CLRA." 402 F.3d at 962. The Ninth Circuit also found that the common issues were "plain enough that no further explanation is needed to justify the district court's decision." Id.

In Wolin, plaintiffs alleged that their Land Rover vehicles suffered from an alignment defect that caused tires to wear out prematurely. The plaintiffs alleged that Land Rover knew of the defect, but continued to sell the vehicles without disclosing the defect to

customers. The district court denied class certification, finding that plaintiffs could not show that common issues predominated, and had not produced sufficient evidence of the rate of defect. The Ninth Circuit reversed, finding that plaintiffs "easily satisfy the commonality requirement," because all of their claims "involve[d] the same alleged defect, covered by the same warranty, and found in vehicles of the same make and model." 617 F.3d at 1172. The court also provided a list of specific common issues: "1) whether the LR3's alignment geometry was defective; 2) whether Land Rover was aware of this defect; 3) whether Land Rover concealed the nature of the defect; 4) whether Land Rover's conduct violated the Michigan Consumer Protection Act or the Florida Deceptive and Unfair Trade Practices Act; and 5) whether Land Rover was obligated to pay for or repair the alleged defect pursuant to the express or implied terms of its warranties." Id. The Wolin court went on to hold that "proof of the manifestation of a defect is not a prerequisite to class certification," and noted that "what Land Rover argues is whether class members can win on the merits." Id. at 1173. The court "reject[ed] Land Rover's suggestion that automobile defect cases can categorically never be certified as a class," and noted that, "although individual factors may affect premature tire wear, they do not affect whether the vehicles were sold with an alignment defect." Id. While the class members did indeed experience premature tire wear at different times (some after six months, some nine months, some later), those facts went "to the extent of their damages and not whether" they had the same interest and suffered the same injury as the rest of the class. Id. at 1175.

Thus, for the same reasons articulated in Chamberlan and Wolin, the court finds that the commonality requirement is met in this case.

3.  Typicality

Defendant raises two challenges to the typicality of the named plaintiffs' claims. First, defendant argues that the named plaintiffs are not members of the class of current owners that they seek to represent, because they sold their vehicles after filing this lawsuit. However, as plaintiffs point out, Chamberlan involved a class of both current and former owners; and like Chamberlan, all members of the proposed class in this case have claims

9

arising from the same scheme. See Chamberlan v. Ford, 223 F.R.D. 524, 526 (N.D. Cal. 2004).

Second, defendant argues that the named plaintiffs experienced "isolated driving experiences" which are "not typical of an alleged soldering issue with a Delta Stroke Sensor." The Ninth Circuit addressed a similar argument in Wolin, where the vehicle manufacturer argued that the named plaintiffs' claims were "not typical because their tires indicate wear that is not the kind attributable to vehicle alignment." 617 F.3d at 1175. The Wolin court rejected that argument, finding that the named plaintiffs sought "to recover pursuant to the same legal theories" as the rest of the class, and that any differences in the manifestation of their vehicles' defects went "to the extent of their damages and not to whether the named appellants possess the same interest and suffered the same injury as the class members." Id. (internal quotations omitted).

As in Chamberlan and Wolin, the court finds that the named plaintiffs' claims are typical of those of the class, and thus Rule 23's typicality requirement is met in this case.

4.  Adequacy of representation

Defendant raises a number of challenges to the adequacy of plaintiffs to represent the class. First, defendant argues that "plaintiffs' claims are subject to unique defenses," but does not identify any defenses that would uniquely apply to the named plaintiffs. Moreover, this challenge appears to be based on the typicality of the named plaintiffs' claims, rather than on plaintiffs' adequacy to represent the class.

Second, defendant argues that "there is no evidence that plaintiffs are able to commit the energy or time required in order to serve as class representatives." To support this argument, defendant points out that plaintiff Soloway admitted that he deletes files from his computer. However, defendant does not allege that plaintiff Soloway destroyed any relevant evidence, making its argument purely speculative.

Third, defendant argues that plaintiffs "actually seek to represent two classes that are in conflict with one another," as the class of current owners would include individuals who purchased their vehicles from members of the class of former owners, and those

10

current owners "may well have claims against the former owners for failing to disclose material facts about the alleged failure of the Delta Stroke Sensor connection." But in making this argument, defendant overlooks the fact that those former owners were not informed of the defect, and thus had no knowledge to disclose to their vehicles' buyers. Further, as discussed above, Chamberlan involved a class of current and former owners, and thus undermines defendant's argument that the possibility of a conflict between class members is sufficient to defeat class certification.

Finally, defendant argues that "there are significant concerns about the ability of plaintiffs' counsel to adequately represent the interests of the class," pointing to the document preservation issue discussed (and rejected as speculative) above, and also pointing to alleged inaccuracies in the plaintiffs' factual allegations, and to plaintiffs' counsel's alleged "questionable conduct" in a case pending in the Western District of Arkansas. Defendant has failed to show how the Arkansas case is relevant to this case, nor has it shown how the non-material inaccuracies in the TAC (which have been remedied in the since-filed fourth amended complaint) would prevent plaintiffs' counsel from adequately representing the class going forward.

Overall, the court finds that plaintiffs do meet the adequacy requirement of Rule 23(a).

5.   Predominance of common questions

The "predominance" analysis in this case is similar (though not identical) to the "commonality" analysis above, and is similarly controlled by the Ninth Circuit's decisions in Chamberlan and Wolin. In Wolin, the Ninth Circuit held that "[c]ommon issues predominate such as whether Land Rover was aware of the existence of the alleged defect, whether Land Rover had a duty to disclose its knowledge and whether it violated consumer protection laws when it failed to do so." 617 F.3d at 1173 (citing Chamberlan). While the defendant in Wolin argued that "the evidence will demonstrate that the prospective class members' vehicles do not suffer from a common defect, but rather, from tire wear due to individual factors such as driving habits and weather," the court rejected that argument,

11

finding that "[a]though individual factors may affect premature tire wear, they do not affect whether the vehicles were sold with an alignment defect." Id. The same rationale applies in this case, because while it is true that some vehicles' defects may have manifested in different ways, the issues of (1) whether Nissan was aware of the alleged defect, (2) whether Nissan had a duty to disclose its knowledge, and (3) whether Nissan violated consumer protection laws when it failed to do so, are common to the class and predominate over any individual issues.

6. Superiority of class treatment

Defendant argues that a superior method of adjudicating plaintiffs' claims would be to go through the NHTSA recall process. However, as plaintiffs point out, the NHTSA has ordered only one recall since 1979, and a recall could take years to complete. Moreover, defendant has provided no reason why the court should undo the progress already made in this case (which has been pending for over two years) in favor of an as-yet-unstarted NHTSA recall process. Overall, the court finds that "although alternative means of recovery are available," class-wide treatment "will reduce litigation costs and promote greater efficiency." Wolin, 617 F.3d at 1176. Thus, the court does conclude that a class action is superior to other methods available for adjudicating this controversy.

7. Ascertainability and overbreadth

Defendant argues that the proposed class is not ascertainable, in that it includes former owners of the vehicles at issue, and overbroad, in that it includes owners who have not experienced actual DSS failure. But, again, both of these arguments have been considered and rejected by the Ninth Circuit. As to ascertainability, Chamberlan involved a class of both current and former owners, and any former owners can self-identify. As to overbreadth, the Wolin court held that "proof of the manifestation of a defect is not a prerequisite to class certification." 617 F.3d at 1173. Thus, the court does not find that either ascertainability or overbreadth serve as an obstacle to class certification.

8. Other motions

As stated above, plaintiffs have also filed a motion for leave to file a fourth amended

complaint, which is GRANTED for the reasons stated at the hearing.

The parties have also filed a number of motions to seal. At the hearing, the court stated that it would deny the three motions to seal filed by plaintiff (Dkts. 77, 90, and 98), as they were not supported by timely-filed declarations from defendant, in accordance with Civil Local Rule 79-5(e). Thus, those three motions are DENIED for the reasons stated at the hearing.

The court deferred ruling on the motion to seal filed by defendant (Dkt. 83), and gave defendant two weeks to file a renewed motion. Defendant filed its renewed motion to seal on November 13, 2013, indicating that it had limited the scope of its motion, and now seeks the sealing of only one document – Exhibit I to the declaration of James W. Blenkarn. The motion to seal is supported by the declaration of Timothy W. Loose, which explains the confidential and proprietary nature of the information contained in the document, and thus, the court GRANTS defendant's renewed motion (Dkt. 112). The court DENIES defendant's original motion to seal (Dkt. 83) as moot.

Defendant filed another motion to seal, on November 12, 2013 (Dkt. 108), but this motion to seal relates only to documents designated as confidential by non-party Continental Automotive Systems, Inc. ("CAS"), and does not make any substantive argument as to why those documents should be sealed. CAS then filed two of its own motions to seal, on November 18, 2013 (Dkt. 113) and on December 16, 2013 (Dkt. 122). Thus, the court need only consider CAS' motions, and DENIES defendant's motion relating to the CAS documents (Dkt. 108) as moot.

CAS' first motion seeks the sealing of six documents: (1) exhibit 10 to the declaration of Donald Margolis, (2) exhibit 21 to the declaration of Donald Margolis, (3) exhibit B to the declaration of Hiryle R. "Ryan" Lutz, (4) exhibit 69 to the deposition of James Blenkarn (which is itself included in exhibit B to the reply declaration of Ryan Lutz), (5) exhibit 81 to the deposition of James Blenkarn (again included as exhibit B to the reply declaration of Ryan Lutz), (6) exhibit 88 to the deposition of James Blenkarn (again included as exhibit B to the reply declaration of Ryan Lutz). This motion is supported by

13

1 the declaration of Michael Vetter, which explains that these documents relate to the
2 algorithm involved in the operation of the OHB braking system, and the input signals used
3 to trigger the OHB mechanism. The court finds that the Vetter declaration is sufficient to
4 support sealing, and thus GRANTS CAS' first motion to seal (Dkt. 113).

5      CAS' second motion seeks the partial sealing of nine documents: (1) exhibit N to the
6 declaration of Ryan Lutz, (2) exhibit E to the declaration of James Blenkarn, (3) exhibit 3 to
7 the declaration of Donald Margolis, (4) exhibit 14 to the declaration of Donald Margolis, (5)
8 exhibit I to the declaration of James Blenkarn, (6) exhibit G to the reply declaration of Ryan
9 Lutz, (7) exhibit J to the declaration of James Blenkarn, (8) exhibit B to the declaration of
10 Rachel Flipse, and (9) exhibit A to the reply declaration of Ryan Lutz. CAS' second motion
11 also requests that ten documents be sealed in their entirety: (1) exhibit F to the declaration
12 of Ryan Lutz, (2) exhibit 7 to the declaration of Donald Margolis, (3) exhibit K to the
13 declaration of Ryan Lutz, (4) exhibit L to the declaration of Ryan Lutz, (5) exhibit C to the
14 declaration of James Blenkarn, (6) exhibit M to the declaration of Ryan Lutz, (7) exhibit 12
15 to the declaration of Donald Margolis, (8) exhibit K to the declaration of James Blenkarn, (9)
16 exhibit 6 to the declaration of Donald Margolis, and (10) exhibit A to the declaration of
17 James Blenkarn. Each of these requests is supported by the declaration of Robert Beaver,
18 which explains that these documents (or the relevant portions of the documents) relate to
19 the algorithm involved in the operation of the OHB braking system, and the input signals
20 used to trigger the OHB mechanism. The court finds that the Beaver declaration is
21 sufficient to support sealing, and thus GRANTS CAS' second motion to seal (Dkt. 122).
22 While the Beaver declaration indicates that these documents were lodged conditionally
23 under seal, CAS' motion indicates that the documents were filed publicly on November 12,
24 2013. Thus, to the extent that any of these documents were filed in the public record, CAS
25 is permitted to have them removed from the public docket.

### CONCLUSION

27      For the foregoing reasons, plaintiffs' motion for class certification is GRANTED,
28 plaintiffs' motion for leave to file a fourth amended class action complaint is GRANTED,

plaintiffs' motions to seal and defendant's original motion to seal are DENIED, defendant's renewed motion to seal is GRANTED, and CAS' motions to seal are GRANTED.

**IT IS SO ORDERED.**

Dated: December 19, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge