UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRANDON BANKS, et al.,

             Plaintiffs,

      v.

NISSAN NORTH AMERICA, INC.,

             Defendant.

Case No. 11-cv-2022-PJH

**ORDER DENYING FINAL
SETTLEMENT APPROVAL AND
ATTORNEYS' FEES**

       The parties' motion for final class action settlement approval and plaintiffs' motion for attorneys' fees came on for hearing before this court on May 20, 2015.  Plaintiffs Brandon Banks, Erin Banks, and David Soloway ("plaintiffs") appeared through their counsel, Michael Ram, Kirk Wolden, and Ryan Lutz.  Defendant Nissan North America, Inc. ("defendant" or "Nissan") appeared through its counsel, G. Charles Nierlich.  After the hearing, the parties submitted a supplemental report regarding the submission of claims to the settlement administrator.  Having read the parties' papers and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

       This is a product liability class action involving Nissan vehicles.  The suit arose out of problems that certain Nissan vehicle owners had with a component of the vehicle's brake booster, called the Delta Stroke Sensor ("DSS").  Plaintiffs Brandon and Erin Banks owned a 2004 Nissan Titan[1], and in the summer of 2010, Ms. Banks was driving the vehicle with her two small children in the back seat.  See Fifth Amended Complaint

---

[1] The complaint originally alleged that the Bankses owned a Nissan Armada, but the operative 5AC states that they owned a Nissan Titan.

("5AC"), ¶¶ 12-13.  Ms. Banks approached an intersection at approximately 40 miles per hour, saw a red light, and applied the brakes.  However, the brakes did not slow the vehicle, even as Ms. Banks "repeatedly attempted to firmly apply and/or pump the brakes."  Id., ¶ 13.  Ultimately, Ms. Banks coasted through the intersection, against the red light, at approximately 40 miles per hour.  Id.

After experiencing multiple similar failures, Mr. Banks took the vehicle back to the dealership, where he was advised that the only way to fix the problem was by replacing the DSS, at a price exceeding $1,000.  5AC, ¶ 14.  Mr. Banks asked if the dealership would pay for the cost of replacement, but the dealership refused.  Id.

Mr. Banks then contacted Nissan's consumer affairs department, but was told that Nissan had made the decision to deny coverage.  5AC, ¶ 19.  As a result of the denial, the Bankses had to pay the cost of the DSS replacement out of pocket, which cost them $967.13.  Id.

Plaintiff Soloway had a similar experience with his 2006 Infiniti QX56.  In August 2011, Mr. Soloway's brother-in-law was driving the vehicle along with Mr. Soloway's wife and son.  5AC, ¶ 21.  As the car approached a red light, the driver attempted to brake, but the vehicle did not stop, ultimately running through the intersection against a red light. Id.  Mr. Soloway contacted the dealership, but was told that he would have to pay for the repair himself, which he did, at a cost of $618.84.  Id., ¶¶ 22-23.

Plaintiffs filed suit in April 2011, alleging that the DSS was defectively designed such that it would fail suddenly and without warning, causing the brakes to lose significant and substantial braking power.

Plaintiffs obtained certification of the following class:

> All consumer residents in California who own 2004-2008 Nissan Armada, Titan (equipped with VDC), and Infiniti QX56 vehicles manufactured before April 1, 2008 ("Affected Vehicles") and all consumer residents in California who do not presently own Affected Vehicles but incurred monetary loss caused by the failure of the Delta Stroke Sensor in their Affected Vehicles. This definition specifically excludes any and all persons who assert personal injury claims arising from or relating to the failure of the Delta Stroke Sensor in their Affected Vehicles.

After certification of the California class, defendant sought permission to appeal the certification order, but the Ninth Circuit denied such permission.  See Dkt. 130. Subsequently, the parties entered into settlement negotiations, and on December 5, 2014, the parties filed a motion for preliminary settlement approval.  The motion sought certification of a nationwide settlement class, defined as follows:

> All persons in the United States who currently own a model year 2004-2008 Nissan Titan (equipped with VDC), Nissan Armada, or Infiniti QX56 vehicle, or do not presently own one of these vehicles but previously did, and incurred the expense of repairing or replacing the Delta Stroke Sensor ("DSS") in the vehicle during their period of ownership.  "Settlement Class Member(s)" means any member of the Settlement Class who does not elect exclusion or opt out from the Settlement Class pursuant to the terms and conditions for exclusion set out in the Settlement Agreement and Release and the Long Form Notice.  Excluded from the Settlement Class are all persons who are employees, directors, officers and agents of NNA or its subsidiaries and affiliated companies, as well as the judges, clerks, and staff members of the United States District Court for the Northern District of California, the Ninth Circuit Court of Appeals, the United States Supreme Court, and their immediate family members.  Also excluded from the Settlement Class are all claims for personal injury relating in any way to 2004-2008 Nissan Titan (equipped with VDC), Nissan Armada, and Infiniti QX56 vehicles.

The proposed settlement provides for reimbursement claims for owners and/or former owners of 263,967 affected vehicles, with the value of the reimbursement claims ranging from $800 to $20 (or less), depending on the mileage of the affected vehicle at the time of repair.  The proposed settlement also provides for $5,000 "service payments" to Erin Banks, Brandon Banks, David Soloway, and Tom West; and for $3,425,000 to be paid to class counsel.

The court granted the parties' motion for preliminary approval on December 24, 2014.  See Dkt. 173.  On May 1, 2015, the parties moved for final approval of the settlement.

At the final approval hearing, the court expressed skepticism that the proposed settlement was fair, reasonable, and adequate.  In particular, the court was concerned about the large drop-off in the reimbursement amounts for claimants whose vehicle's

3

1   mileage was over 60,000 miles at the time of repair, the documentation required to

2   submit a successful claim (including the requirement that the repair receipt contain the

3   specific "C1179" error code), and the fact that only 1,472 class members had submitted

4   claims.

5           In addition, the parties were unable to provide any information regarding the

6   reimbursement amounts that those 1,472 claimants would receive – in other words,

7   whether the majority of those claimants would receive $800, or $20, or something in

8   between.  The court also discussed the objections filed by class members, most of which

9   focused on the small percentage of repair costs that were being reimbursed and the large

10  proposed award of attorneys' fees.

11          Taking into account the objections as well as the court's own concerns, the court

12  opted to defer a determination on the settlement until after it received a final claims

13  submissions report.  Specifically, the court directed the parties to have the settlement

14  administrator file a report setting forth (1) the overall number of claims granted and

15  denied, (2) how many (if any) claims were denied because of the absence of a diagnostic

16  code on the claim submission form, and (3) how many claimants fell within each of the

17  payout ranges.

18          On October 9, 2015, the settlement administrator filed a report indicating that

19  2,100 claims had been submitted, of which 1,540 were determined to be valid.  <u>See</u> Dkt.

20  201.  None were denied based on the absence of a diagnostic code, though 494 claims

21  were denied for failure "to provide any supporting documentation of a brake booster

22  repair."  There are 66 additional claims which were "pending a final status" because the

23  administrator had requested additional information from the claimants.

24          The payout ranges of the claims are as follows:

25

26

27

28

4

| Mileage range | Reimbursement rate | Number of valid claims | Total payout | Average payout |
|---|---|---|---|---|
| Under 48,000 | 80% (of repair costs, with a $800 max) | 194 | $111,479.26 | $574.64 |
| 48,000-60,000 | 57.5% ($575 max) | 131 | $53,469.78 | $408.17 |
| 60,000-80,000 | 20% ($200 max) | 320 | $48,562.04 | $151.76 |
| 80,000-100,000 | 17.5% ($175 max) | 334 | $46,234.52 | $138.43 |
| 100,000-120,000 | 6% ($60 max) | 241 | $11,810.81 | $49.01 |
| Over 120,000 | $20 max | 320 | $6,500.00 | $20.31[2] |
| **Total** | | **1,540** | **$278,056.41** | **$180.56** |

**DISCUSSION**

A.      Legal Standard

      1.      Motion for final settlement approval

A certified class action may not be settled without court approval.  See Fed. R. Civ. P. 23(e)(1)(A).  In order for approval to be granted, the court must find that the settlement is "fair, reasonable, and adequate," after holding a hearing on the matter.  See Fed. R. Civ. P. 23(e)(1)(C).  At the fairness hearing, the burden is on the proponents of the settlement to disclose what consideration is being given or paid for the dismissal of the class claims, and they must further prove that: the settlement is not collusive and is the result of arms' length negotiation; sufficient discovery has been conducted by the lawyer representing the class to evaluate claims and defenses; the lawyer recommending the settlement is competent, experienced and not subject to influence by the opposing party; and only a small fraction of the class has objected.  See, e.g., In re General Motors

---

[2] The parties have not explained how this number is above $20 when the maximum payout for this mileage range was supposed to be $20.

5

United States District Court
Northern District of California

1  Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995); In re

2  Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1126 (7th Cir. 1979).

3      Ultimately, in deciding whether the settlement is fair and reasonable, the court

4  will consider such factors as (1) the strength of the plaintiffs' case; (2) the risk, expense,

5  complexity, and likely duration of further litigation; (3) the risk of maintaining class action

6  status throughout the trial; (4) the amount offered in settlement; (5) the extent of

7  discovery completed and the stage of the proceedings; (6) the experience and views of

8  counsel; (7) the presence of a governmental participant; and (8) the reaction of the class

9  members to the proposed settlement.  Churchill Village, LLC v. General Electric, 361

10  F.3d 566, 575 (9th Cir. 2004); see also Rodriguez v. West Publishing Group, 563 F.3d

11  948, 963 (9th Cir. 2009).

12      Any class member may object to the proposed settlement, and the trial court must

13  allow all objectors the opportunity to present evidence showing that the settlement is

14  contrary to the best interests of the class.  See In re Gen. Motors Corp., 594 F.2d at

15  1131.

16      2.    Motion for attorneys' fees

17      Attorneys' fees and costs may be awarded in a certified class action under Federal

18  Rule of Civil Procedure 23(h).  When included in a class action settlement agreement,

19  attorneys' fees provisions, like every other aspect of such agreements, must be found

20  "fair, reasonable, and adequate" in order to be approved.  Fed. R. Civ. P. 23(e); Staton v.

21  Boeing Co., 327 F.3d 938, 963 (9th Cir. 2003).  To "avoid abdicating its responsibility to

22  review the agreement for the protection of the class, a district court must carefully assess

23  the reasonableness of a fee amount spelled out in a class action settlement agreement."

24  Staton, 327 F.3d at 963.

25      The Ninth Circuit has approved two different methods of calculating reasonable

26  attorneys' fees in common fund cases:  the percentage method and the lodestar method.

27  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998).  The percentage method

28  simply awards the attorneys a percentage of the fund.  The Ninth Circuit has established

6

1    twenty-five percent as the benchmark in percentage-of-the-fund cases, which can be

2    adjusted upward or downward to account for any unusual circumstances presented by

3    the particular case.  Id.

4           The lodestar method is primarily used in cases involving a statutory fee-shifting

5    provision or where the relief sought is injunctive in nature and thus not easily monetized.

6    See, e.g., Hanlon, 150 F.3d at 1029; In re General Motors, 55 F.3d at 821.  In lodestar

7    cases, "to calculate the 'lodestar' amount, [the court] multipl[ies] the number of hours

8    reasonably expended by the attorney(s) on the litigation by a reasonable hourly rate,

9    raising or lowering the lodestar according to the factors identified by this circuit."  Gerwen

10   v. Guarantee Mutual Life Co., 214 F.3d 1041, 1045 (9th Cir. 2000).  The Supreme Court

11   has articulated eleven factors relevant in calculating the lodestar figure: (1) the time and

12   labor required; (2) the novelty and difficulty of the issues; (3) the skill requisite to perform

13   the legal service properly; (4) the preclusion of employment by the attorney due to

14   acceptance of the case; (5) the customary fee; (6) time limitations; (7) the amount

15   involved and the results obtained; (8) the experience, reputation and ability of the

16   attorneys; (9) the undesirability of the case; (10) the nature and length of the professional

17   relationship with the client; and (11) awards in similar cases.  Hensley v. Eckerhart, 461

18   U.S. 424, 433 (1983).

19          While courts have discretion to use either the percentage method or the lodestar

20   method, such discretion should be exercised to achieve the ultimate goal of a reasonable

21   award.  In re Coordinated Pretrial Proceedings, 109 F.3d 602, 607 (9th Cir. 1997).

22   B.     Legal Analysis

23          In the context of class action settlements, the district court has a duty to safeguard

24   the interests of the class members.  The Ninth Circuit has referred to this as a "fiduciary

25   duty," subject to the "high duty of care that the law requires of fiduciaries."  Allen v.

26   Bedolla, 787 F.3d 1218, 1223 (9th Cir. 2015) (citing Reynolds v. Beneficial Nat'l Bank,

27

28

United States District Court
Northern District of California

288 F.3d 277, 280 (7th Cir. 2002)).[3]  To that end, the court has reviewed not only the cases cited within the two pending motions, but has also considered other relevant Ninth Circuit case law.  In particular, the court finds that In re Bluetooth Headset Products Liability Litigation, a case not included among the 47 cited in the two motions, addresses many of the issues raised by the proposed settlement.  Bluetooth, 654 F.3d 935 (9th Cir. 2011).

The Bluetooth case arose out of the failure to disclose the risk of hearing loss associated with wireless Bluetooth headsets.  The parties entered into a proposed nationwide settlement, its terms providing for injunctive relief (in the form of safety warnings on the products' packaging and manuals), a $100,000 cy pres award, notice costs of up to $1.2 million, an incentive award of $12,000, and attorneys' fees and costs in the amount of $850,000.  The district court approved the settlement, and seven objectors appealed both the final approval order and the order awarding attorneys' fees.

The Ninth Circuit's opinion started by noting that its typical practice was to review the final approval order first, because a vacatur would render moot any challenge to the fee order.  However, because the objectors' challenge to the settlement agreement was largely based on the alleged unreasonableness of the fee award, the court started by evaluating the fee order.

The Bluetooth court set forth the applicable legal standard, noting that the lodestar method was "appropriate in class actions brought under fee-shifting statutes . . . where the relief sought – and obtained – is often primarily injunctive in nature and thus not easily monetized."  654 F.3d at 941.  The court also explained that the lodestar amount can be adjusted depending on the quality of representation, the benefit obtained for the

---

[3] In some cases, the Ninth Circuit has seemingly limited its characterization of the district court as a fiduciary, discussing it only in the context of awarding attorneys' fees from a common fund that would otherwise be paid to the class members.  See, e.g., Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1052 (9th Cir. 2002).  However, more recent cases such as Allen have discussed the fiduciary duty's scope more broadly, applicable to the entire settlement approval process.  Allen, 787 F.3d at 1223 (citing Sullivan v. DB Investments, Inc., 667 F.3d 273, 319 (3rd Cir. 2011); Reynolds, 288 F.3d at 280)).

United States District Court
Northern District of California

1   class, the complexity and novelty of the issues presented, and the risk of non-payment,

2   emphasizing that "foremost among these considerations, however, is the benefit obtained

3   for the class." Id. at 942.

4        Applying that standard, the Ninth Circuit noted that the district court applied the

5   lodestar method and approved the award even after "finding numerous defects" in the

6   lodestar calculation, including "duplicative entries, excessive charges for most categories

7   of services, a substantial amount of block billing, and use of an inflated hourly rate." 654

8   F.3d at 943.

9        On appeal, the objectors argued that the district court should not have relied

10  exclusively on the lodestar method, and should have used the "constructive common

11  fund" approach, which had been adopted by other circuits as a way to safeguard against

12  "private agreements to structure artificially separate fee and settlement arrangements"

13  designed to "circumvent the 25% benchmark on what is in economic reality a common

14  fund situation."  In other words, creating separate funds for the class and for attorneys'

15  fees could be an attempt to avoid direct comparison of the two amounts, and to convince

16  the court that it need look no further than the lodestar figure.

17       The Ninth Circuit stopped short of requiring the district court to treat it as a

18  constructive common fund case, but it did "agree with objectors that the district court

19  needed to do more to assure itself – and us – that the amount awarded was not

20  unreasonably excessive in light of the results achieved." 654 F.3d at 943.  The court

21  explained that the lodestar method "may be a perfectly appropriate method of fee

22  calculation," but that courts were encouraged to "guard against an unreasonable result by

23  cross-checking their calculations against a second method."  And "if the district court here

24  took that second look, the record does not reflect it."

25       In particular, the Ninth Circuit was "concerned that the amount awarded was

26  83.2% of the total amount defendants were willing to spend to settle the case."  To reach

27  that figure, the court added the attorneys' fee and costs awards, the incentive payment,

28  and the cy pres payment into a "constructive common fund."

1    While the <u>Bluetooth</u> court did not say that the fee award was per se unreasonable,

2    it did vacate the award and remanded it to the district court to (1) decide whether to treat

3    the settlement as a common fund, (2) choose the lodestar or percentage method for

4    calculating a reasonable fee and make explicit calculations, (3) ensure that the fee award

5    is reasonable considering, among other things, the degree of success in the litigation and

6    benefit to the class, and (4) if standard calculations yield an unjustifiably disproportionate

7    award, adjust the lodestar or percentage accordingly.  654 F.3d at 945.  After vacating

8    the fee award, the Ninth Circuit then explained that "because the parties expressly

9    negotiated a possibly unreasonable amount of fees, and because the district court did not

10   take this possibility into account in reviewing the settlement's fairness the first time

11   around, we must vacate and remand the approval order as well."  <u>Id</u>. at 945-46.

12   Applying the reasoning of <u>Bluetooth</u> to this case, the court first finds that, as in

13   <u>Bluetooth</u>, much of the objectors' challenge to the fairness of the settlement relates to the

14   imbalance between the proposed fee award and the benefit going to the class.  For

15   instance, one objector emphasized the "obscene amount of money to attorneys and the

16   paltry amount to the actual consumers," while another complained that "the value of the

17   proposed settlement and the portion paid to the claimants is too low," and that the

18   "lawyers are not entitled to 68.5%[4] of the payout."  <u>See</u> Dkt. 176, 183.  Thus, as in

19   <u>Bluetooth</u>, the court will start by evaluating the requested attorneys' fees.

20   Class counsel urges application of the lodestar method, emphasizing that the

21   requested fee award represents a negative multiplier of .76.  However, the court cannot

22   simply accept counsel's lodestar figure without any scrutiny, because the court's duty is

23   to "calculate the lodestar figure based on the number of hours <u>reasonably</u> expended on

24   the litigation."  <u>Bluetooth</u>, 654 F.3d at 944 (emphasis in original).  In this case, the court

---

[4] The parties correctly point out that this objector "apparently and mistakenly uses the $5,000,000 CAFA jurisdiction allegation in the complaint as the denominator in his equation."  Dkt. 186 at 16.  However, the ironic result of this mathematical error is that the objector <u>understated</u> the percentage of the payout going to the attorneys, as the actual figure is 80.3%.

United States District Court
Northern District of California

1   has no basis on which to find that the fees incurred were reasonable, because none of

2   plaintiffs' attorneys have provided detailed time records.  Instead, they rely on summary

3   figures showing the amount of time billed by each attorney and/or the amount of time

4   spent on general tasks (broken down into very high-level categories, such as "discovery"

5   or "class certification").  See Dkt. 177-1 through 177-4.

6           In Bluetooth, the Ninth Circuit took issue with the district court's approval of the

7   fee award, noting the presence of "numerous defects" in the lodestar's calculation,

8   including duplicative billing entries, excessive charges, and block billing.  654 F.3d at

9   943.  The same defects might very well be present in this case, but because the billing

10   records were not filed with the court, there is no way to tell.  Regardless, even if the court

11   could make a determination as to the reasonableness of the lodestar figure, the court is

12   guided by the Bluetooth court's recommendation to "guard against an unreasonable

13   result by cross-checking their calculations against a second method."

14           As did the Bluetooth court, this court will apply the constructive common fund

15   approach.  And as was the case in Bluetooth, the parties have structured the proposed

16   attorneys' fee award separately from the funds available to the class.  The Bluetooth

17   court noted prior courts' warning that "private agreements to structure artificially separate

18   fee and settlement arrangements should not enable parties to circumvent the 25%

19   benchmark requirement on what is in reality a common fund situation."  654 F.3d at 943

20   (internal citations omitted); see also Staton, 327 F.3d at 964 ("That the defendant in form

21   agrees to pay the fees independently of any monetary award or injunctive relief provided

22   to the class in the agreement does not detract from the need carefully to scrutinize the

23   fee award."); Johnston v. Comerica Mortgage Corp., 83 F.3d 241, 246 (8th Cir. 1996)

24   ("[I]n essence the entire settlement amount comes from the same source.  The award to

25   the class and the agreement on attorney fees represent a package deal.").

26           Under the "constructive common fund" approach, the attorneys are receiving

27   80.3% of the "total amount defendants were willing to spend to settle the case" – with the

28   settlement administrator receiving 12.7%, and the claimants (other than the class

United States District Court
Northern District of California

1  representatives) receiving 6.5% of the total amount paid.[5]  Whereas the <u>Bluetooth</u> court

2  found it unacceptable for class counsel to receive <u>eight</u> times the amount of the class

3  recovery, noting the "gross disproportion between the class award and the negotiated fee

4  award," class counsel in this case aims to receive over <u>twelve</u> times the amount of the

5  class recovery.  <u>See also</u> <u>Allen</u>, 787 F.3d at 1224 (finding disproportionate distribution

6  where counsel received three times the maximum class recovery).  Even the settlement

7  administrator would receive nearly twice the amount that the class would receive.[6]

8        The <u>Bluetooth</u> court made clear that, when evaluating the reasonableness of an

9  attorneys' fee award, the "foremost" consideration is the benefit obtained for the class.

10  Under this standard, the requested attorneys' fee award is problematic.  As mentioned

11  above, class counsel would receive over twelve times the amount of the class recovery

12  under the proposed settlement.  The average claimant would receive $180.56, although

13  even that number is skewed by the claimants on the low end of the mileage range.  More

14  than one-fifth of the claimants will receive $20, and more than one-third of the claimants

15  will receive $60 or less.

16        Looking more closely at those bottom two tiers, the 561 claimants in those

17  categories (who represent more than one-third of the class) would receive a <u>total</u> of

18  $18,310.81.  Meanwhile, the four class representatives would receive a total of $20,000

19  ($5,000 each).  And as mentioned above, class counsel would receive $3,425,000.  The

20  court also notes that, in <u>Bluetooth</u>, the class received a benefit in the form of injunctive

21  _____

22  [5] The total amount of the constructive common fund is $4,265,564.55, which includes the
   $278,056.41 to be paid to the claimants, the $20,000 service payments to be paid to the

23  four class representatives, the $3,425,000 to be paid to class counsel, and the
   $542,508.14 to be paid to the settlement administrator.

24  [6] Although it does not affect the court's decision, the court does note the discrepancy
   between the amount requested for the settlement administrator at preliminary approval –

25  which was "estimated to be in the range of $179,688 to $377,669" – and the amount that
   the settlement administrator now claims to have incurred – $542,508.14.  <u>Compare</u> Dkt.

26  159 at 7 <u>with</u> Dkt. 201 at 1.  This new, higher figure is not mentioned anywhere in the
   motion for final approval, the motion for attorneys' fees, or the proposed order, leaving

27  the court unclear as to whether the parties are asking for final approval of an amount that
   far exceeds the amount preliminarily approved.  Incidentally, if the settlement

28  administrator is to receive only the $377,669 that was preliminarily approved, then class
   counsel's percentage of the constructive common fund jumps to 83.5%.

United States District Court
Northern District of California

1   relief, which was described by the plaintiffs' counsel as the "primary objective of the

2   lawsuit."  654 F.3d at 945.  No such benefit was provided to the class in this case, as the

3   challenged practice ceased long before the filing of this suit.

4           The court is aware that, given the relatively small percentage of Affected Vehicle

5   owners who may have experienced brake failure, even a reasonable settlement will likely

6   result in class counsel recovering more than the class.  For instance, if every single one

7   of the 1,540 valid claimants had received the "maximum" $1,000 in repair costs, it would

8   still result in class recovery of only $1,540,000, less than half of the amount that class

9   counsel would receive under the proposed settlement.  Despite that disparity, the court

10  would not be troubled by such a settlement, because the class would undoubtedly be

11  receiving a significant benefit.  In fact, if the experiences of the Bankses and the

12  Soloways are any indication, many of the class members may have paid <u>less</u> than the

13  estimated $1,000 in order to fully repair their vehicles.  As mentioned above, Mr. Soloway

14  paid $618.84 for DSS replacement, and the Bankses paid $967.13.  If these figures are

15  representative, then the claimants could be fully compensated at an average of just under

16  $800 per claimant, or just over $1.2 million for all 1,540 claimants.[7]  Even though the

17  proposed attorneys' fee award is nearly triple that amount, the court obviously could have

18  no issue with a settlement where the claimants are receiving a recovery equal to, or even

19  closely approaching, what could be obtained at trial.

20          In contrast, where more than one-third of the claimants are receiving $60 or less –

21  i.e., 6% or less of the estimated repair cost; and where more than one-fifth of the

22  claimants are receiving $20 or less, the grossly disproportionate amount of attorneys'

23  fees is problematic.  In this scenario, it cannot be said that the class is receiving a

24

25  ─────────────────────
    [7] The settlement administrator's report also suggests that the class representatives'
26  figures are representative.  For instance, claimants in the 80% reimbursement category
    would receive an average payout of $574.64, indicating that their average repair cost was
27  $718.30; claimants in the 57.5% reimbursement category would receive an average
    payout of $408.17, indicating that their average repair cost was $709.86; and claimants in
28  the 20% reimbursement category would receive an average payout of $151.76, indicating
    that their average repair cost was $758.80.  <u>See</u> Dkt. 201.

1   "substantial benefit" sufficient to justify the much larger benefit conferred upon class

2   counsel.  Accordingly, the motion for attorneys' fees is DENIED.

3          As was the case in <u>Bluetooth</u>, approval of the settlement agreement was not

4   conditioned on the award of attorneys' fees, so the rejection of the fee award does not

5   necessitate rejection of the settlement agreement.  As mentioned above, when evaluating

6   the fairness of a proposed class action settlement, courts consider the following factors:

7          (1) the strength of the plaintiff's case, (2) the risk, expense, complexity, and
           likely duration of further litigation, (3) the risk of maintaining class action
8          status throughout the trial, (4) the amount offered in settlement, (5) the
           extent of discovery completed and the stage of the proceedings, (6) the
9          experience and views of counsel, (7) the presence of a governmental
           participant, and (8) the reaction of the class members to the proposed
10         settlement.

11  <u>Churchill</u>, 361 F.3d at 575.

12         Starting with (1), the strength of the plaintiffs' case, plaintiffs now argue that, while

13  they have a "strong case," there still remains "the presence of significant risks," especially

14  for the non-California class members, whose states' laws might preclude recovery.

15         The issue regarding the non-California class members affects not only this factor,

16  but the final approval motion as a whole.  The Ninth Circuit has held that, "[p]rior to formal

17  class certification, there is an even greater potential for breach of fiduciary duty owed the

18  class during settlement," and thus, "such agreements must withstand an even higher

19  level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily

20  required." <u>Bluetooth</u>, 654 F.3d at 946.  As mentioned above, the court has already

21  certified a class of California class members, but the proposed settlement involves a

22  broader nationwide class, for which plaintiffs have not previously moved for certification.

23  Thus, the proposed nationwide settlement class is technically a pre-certification class.

24  However, not all of the concerns motivating this "higher level of scrutiny" for pre-

25  certification class are applicable here.  For instance, unlike most pre-certification cases,

26  extensive discovery has been conducted in this case, lessening the concern over

27  informational deficiencies between the parties.  <u>See, e.g.</u>, <u>In re General Motors</u>, 55 F.3d

28

14

1   at 805 (internal citations omitted).  That said, other courts' concerns about defendants

2   using the uncertainty surrounding class certification to exert "improper pressure" on class

3   counsel appears to be as present here as it would in any pre-certification case.  <u>See,</u>

4   <u>e.g.</u>, <u>Weinberger v. Kendrick</u>, 698 F.2d 61, 72-73 (2nd Cir. 1982).  Even though there is

5   no certified nationwide class, the court will give the parties the benefit of the doubt and

6   apply the lower, post-certification level of scrutiny.

7          In discussing the strength of their case, plaintiffs also note that defendant "has

8   contested and would continue to contest vigorously the merits of class members' claims,"

9   and that it "has interposed several defenses to the claims asserted, including that it had

10  no knowledge of the defect."  Dkt. 186 at 9.  However, an evaluation of the "strength of

11  plaintiffs' case" requires more than just a recitation of defendant's anticipated arguments,

12  it requires analysis of the merits of those arguments.

13         Not surprisingly, before the proposed settlement was reached, plaintiffs had more

14  to say regarding defendant's alleged knowledge of the defect.  In their motion for class

15  certification, plaintiffs argued that "[b]y 2004, Nissan knew of the DSS safety defect,"

16  citing to internal documents showing awareness of the problem, as well as NHTSA

17  complaints and warranty claims from that time period.  <u>See</u> Dkt. 109 at 5-8.  In fact,

18  plaintiffs specifically referenced Nissan's attempts to have this suit dismissed based on

19  its alleged lack of knowledge of the defect, and stated that Nissan "made these

20  representations to the court with reckless disregard to a wealth of contrary knowledge

21  confirmed in its own internal documents."  Dkt. 109 at 2.

22         Plaintiffs went on to cite evidence showing that, even after knowing about the

23  problem, Nissan continued to "promote" a "faulty" reprogramming fix, even though it

24  "knew that the faulty reprogramming fix did not work."  Dkt. 109 at 9.

25         In their reply, plaintiffs cited even more evidence showing that "Nissan has been

26  investigating the DSS failures since the start of production in 2003," and that it had

27  "created a task force to investigate [DSS] failures."  Dkt. 111 at 5.  Plaintiffs insisted that

28  the evidence showed that "Nissan is ultimately responsible for taking five years to

United States District Court
Northern District of California

15

1    effectively fix the defect after discovering it, and never disclosing it to consumers." Id. at

2    6. While plaintiffs' cited evidence is not dispositive, it must be factored into the court's

3    evaluation of the strength of plaintiffs' case.

4        Overall, the court agrees that the non-California plaintiffs would face significant

5    obstacles if the case were to be litigated, because of the differences in various states'

6    laws. That said, given the incompleteness of plaintiffs' characterization of the strength of

7    their case, the court finds this factor to weigh only slightly in favor of approving the

8    proposed settlement.

9        Moving to factor (2), the risk, expense, complexity, and likely duration of further

10   litigation, plaintiffs argue that, if litigation were to continue, the class would face

11   "significant hurdles, including additional merits discovery, expert witness challenges, a

12   summary judgment motion wherein defendant would seek a binding dismissal of all

13   members' claims, and a lengthy, technical trial on the merits." The court agrees that

14   further litigation would entail expense and complexity, but the final approval motion

15   provides no basis on which to evaluate the actual risk to the class. As with the previous

16   factor, by simply reminding the court that defendant "will seek a binding dismissal" at

17   summary judgment, plaintiffs avoid any discussion of the risk of defendant actually

18   obtaining such a dismissal. Because there is no question that continued litigation would

19   involve additional time, expense, and complexity, the court finds that factor (2) weighs in

20   favor of approving the settlement. However, due to the lack of discussion regarding the

21   risk to the class, the court will give only minimal weight to this factor.

22       As to factor (3), the risk of maintaining class action status throughout trial and on

23   appeal, the court is somewhat puzzled by plaintiffs' argument. They point out that

24   "defendant maintained that plaintiffs' claims were not subject to class-wide

25   determination," because, among other things, "class issues are not predominant where

26   not all class members' vehicles have manifested the alleged latent defect." Dkt. 186 at

27   11. Plaintiffs further note that "defendant vigorously opposed class certification, and

28   would be able to appeal the court's certification decision as of right after a decision on the

16

1    merits." Id.

2         However, in making this argument, plaintiffs appear to ignore the fact that

3    defendant has already sought permission to appeal the court's order certifying a class, a

4    request that the Ninth Circuit denied nearly two years ago. See Dkt. 130. Nor does the

5    fact that defendant "vigorously opposed" class certification (in the past tense) have any

6    bearing on the risk of maintaining the current class action status. Overall, given the lack

7    of any changed circumstances since the court's certification of a California class and the

8    Ninth Circuit's denial of permission to appeal that certification, the court finds that

9    plaintiffs have not demonstrated any risk of losing class action status. However, due to

10    the above-mentioned differences in states' laws, the court does find there to be

11    significant risk in obtaining non-conditional certification for a nationwide class. And

12    because the proposed settlement class is a nationwide class, the court finds this factor to

13    weigh in favor of approving the settlement.

14         Next is factor (4), the amount offered in settlement. Plaintiffs argue that the

15    settlement provides "substantial benefits" to the class, including "crucial notice of the

16    alleged DSS defect" and "partial reimbursement of their expenses." As an initial matter,

17    the already-certified California class would have received notice of the defect immediately

18    after certification, and the only reason that they did not receive such notice was this

19    pending proposed settlement. Thus, as to the California class members, such notice

20    should not be considered as one of the benefits conferred by the proposed settlement.

21         Regarding the "partial reimbursement" portion of the proposed settlement, the

22    court has already discussed the value of the relief that the class would receive. For those

23    reasons, the court finds that this factor weighs heavily against approving the proposed

24    settlement.

25         As to factor (5), the extent of discovery and the state of the proceedings, the

26    motion points out that the parties have undergone more than four years of investigation

27    and litigation, including 18,000 pages of technical documents produced by defendant.

28    The court agrees that the record in this case is well-developed, and finds that this factor

1    weighs in favor of approving the proposed settlement.  Plaintiffs further argue that it is

2    "appropriate to consider class counsel's prior experience with consumer class actions,

3    including litigation involving automotive defects," but the court disagrees, as such

4    consideration would impermissibly mix factor (5) with factor (6).

5         Turning to factor (6), the experience and views of counsel, plaintiffs' counsel

6    contends that the proposed settlement is an "excellent result," and cite a declaration by

7    the parties' mediator also stating that "this settlement is an excellent result."  This factor

8    weighs in favor of approving the proposed settlement, although the result is clearly more

9    "excellent" for the attorneys than it is for the class members.

10        Factor (7) relates to the presence of a government participant, which is not

11   applicable in this case.

12        Finally, factor (8) considers the reaction of the class to the proposed settlement.

13   Plaintiffs point out that only 101 class members have objected or opted out of the

14   settlement, though they incorrectly state that this represents less than 0.012% of the

15   class – because while notice was sent to 857,444 current and former Affected Vehicle

16   owners, there were only 263,967 Affected Vehicles, so the latter number should be used

17   as a denominator.  Regardless, it appears clear that the number of objections is relatively

18   small.

19        That said, the "reaction of the class" must account not only for the objections and

20   opt-outs, but also the claim submission rate.  The report filed by the claims administrator

21   stated that, as of October 9, 2015, 2,100 claims had been submitted, of which 1,540 were

22   determined to be valid.  In other words, only 0.58% of the class submitted a valid claim

23   (using 263,967 as the denominator – if 857,444 is used as the denominator, as it was

24   above, then the claim submission rate drops to 0.17%).  And while some courts have

25   held that "silence constitutes tacit consent to the agreement," "a combination of

26   observations about the practical realities of class actions has led a number of courts to be

27   considerably more cautious about inferring support from a small number of objectors to a

28   sophisticated settlement."  See In re General Motors, 55 F.3d at 812 (internal citations

United States District Court
Northern District of California

18

omitted).  The court finds this factor to be neutral.

Overall, as was the case in <u>Bluetooth</u>, a number of the <u>Churchill</u> factors weigh in favor of approving the proposed settlement, and a number weigh against it.  As in <u>Bluetooth</u>, "further litigation would be time-consuming, complex, and expensive for both sides," the parties have "consulted experts and exchanged significant discovery permitting an informed decision about settlement," and the settlement was "negotiated over an extended period of time by experienced counsel on both sides, and was mediated and approved by a retired judge."  <u>Bluetooth</u>, 654 F.3d at 946.

However, those factors cannot alleviate the court's concerns over the sufficiency of the amounts offered in settlement.  As mentioned above, under this proposed settlement, more than one-third of the claimants would receive a $60 (or less) reimbursement of a $1,000 repair bill, and more than one-fifth of the claimants would receive $20 or less.  Given that the "primary concern" of the settlement approval process is the "protection of those class members . . . whose rights may not have been given due regard by the negotiating parties," the court finds that the strikingly low reimbursement amounts must figure prominently in the court's assessment of the settlement.  <u>See Officers for Justice v. Civil Service Com'n of the City and County of San Francisco</u>, 688 F.2d 615, 624 (9th Cir. 1982).

The parties have attempted to justify the $60 or $20 caps by arguing that "people have had the vehicles for a longer period of time," and thus, the vehicle's value may have depreciated.  Dkt. 196 at 11.  The court pointed out that "even on a depreciated vehicle, the cost to replace it would be the same," and more importantly, the court sees no reasonable basis for dropping the amount of reimbursement to below $60 for more than a third of the claimants, and down to $20 for one-fifth of the claimants.  The court also notes that multiple objectors first experienced DSS problems when they were under 48,000 miles (at which time they would have been eligible for the maximum $800 reimbursement under the proposed settlement), but when they took their vehicles in for repair, they were told that the problem could not be fixed.

1    For instance, objector Todd Ouzts writes that he was "plagued by the braking

2    failures described in the lawsuit well before the 48,000 mile mark," but because "Infiniti

3    could not find the cause," he was "merely told to pull over immediately and restart the

4    vehicle." See Dkt. 176.  Similarly, objector Theresa Dahlen first experienced problems at

5    35,881 miles, but the problems arose only sporadically, and she was told by Nissan that

6    "they couldn't fix it if it wasn't acting up at that time." See Dkt. 178.  When combined with

7    the fact that Nissan promoted an ineffective[8] reprogramming fix starting in 2006, it seems

8    apparent that the class members were steered away from DSS replacement when

9    problems first started to present themselves.

10    To be clear, the court is aware of no evidence that Nissan intentionally delayed

11    repairing their customers' vehicles in order to gain some advantage in anticipated

12    litigation.  However, the parties' methodology of tying reimbursement amounts to vehicle

13    mileage has the effect of allowing defendant to profit from their sluggishness in fixing the

14    DSS failures.  As some customers were being told that the problem could not be

15    diagnosed, or that a reprogram would solve the problem, their reimbursement totals were

16    dropping, from a maximum of $800, potentially all the way down to $20.

17    Simply put, the court cannot find that a settlement which would reimburse a

18    significant portion of the claimants only $20 of a potential $1,000 repair bill serves the

19    interests of the class.  Even when viewed with the remaining Churchill factors, some of

20    which weigh in favor of the settlement, the court finds that the motion for final settlement

21    approval must be denied.

22    Moreover, in addition to considering the Churchill factors, the court must also

23    determine whether the settlement is the result of "collusion between the negotiating

24    parties." See, e.g., Officers for Justice, 688 F.2d at 625.  The Bluetooth court spoke of

25    the need to be "vigilant not only for explicit collusion, but also for more subtle signs that

26    class counsel have allowed pursuit of their own self-interests and that of certain class

---

[8] Nissan admits that the reprogramming fix "did not have the outcome that was desired."
Dkt. 196 at 14.

United States District Court
Northern District of California

members to infect the negotiations."  654 F.3d at 947.  The court then went through three

such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded,

> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class, and

> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

The Bluetooth court found that all three signs were present.  654 F.3d at 947.

Here, too, all three signs are present.  First, as has been discussed above,

counsel is receiving over twelve times the amount paid to the class members.

Second, the settlement agreement does contain a "clear sailing" provision,

whereby defendant agreed not to contest class counsel's requested fees, and providing

for such fees to be paid separately from the funds made available to the class.  As the

Bluetooth court noted, "the very existence of a clear sailing provision increases the

likelihood that class counsel will have bargained away something of value to the class."

Bluetooth, 654 F.3d at 948 (citing Weinberger, 925 F.2d at 525); see also Redman v.

RadioShack Corp., 768 F.3d 622, 637 (7th Cir. 2014) ("Because it's in the defendant's

interest to contest that request in order to reduce the overall cost of the settlement, the

defendant won't agree to a clear-sailing clause without compensation – namely a

reduction in the part of the settlement that goes to the class members, as that is the only

reduction class counsel are likely to consider.").  Although the settlement agreement

states that the allowance or disallowance of attorneys' fees is "not part of the settlement"

and "are to be considered by the court separately from the court's consideration of the

fairness, reasonableness, and adequacy of the settlement" (Dkt. 160-1 at ¶ 37), that

provision cannot override Ninth Circuit precedent, which requires the court to scrutinize

1    the fee arrangement for evidence that the settlement itself was the product of collusion.

2    See Bluetooth, 654 F.3d at 947; Allen, 787 F.3d at 1224.

3    Third and finally, the proposed settlement does indeed provide for any reduction of

4    the attorneys' fee award to revert to defendant.  See Dkt. 177 at 12.  As the Bluetooth

5    court observed, "a kicker arrangement reverting unpaid attorneys' fees to the defendant

6    rather than to the class amplifies the danger of collusion already suggested by a clear

7    sailing provision."  654 F.3d at 949.

8    While the presence of the three "warning signs" does not mean that the settlement

9    cannot still be fair, reasonable, or adequate, a district court faced with "multiple indicia of

10   possible implicit collusion" has a "special obligation to assure itself that the fees awarded

11   in the agreement" are not "unreasonably high."  Bluetooth, 654 F.3d at 947 (citing Staton,

12   327 F.3d at 965); see also Allen, 787 F.3d at 1224.  If the fees are unreasonably high,

13   "the likelihood is that the defendant obtained an economically beneficial concession with

14   regard to the merits provisions, in the form of lower monetary payments to class

15   members or less injunctive relief for the class than it otherwise could have obtained."

16   Bluetooth, 654 F.3d at 947 (citing Staton, 327 F.3d at 964).  The court also notes that, by

17   expanding the settlement class to a nationwide one, defendant is able to "buy peace" in a

18   manner that would have been impossible if the parties had continued to litigate the

19   California-only class.  Thus, not only is defendant receiving an "economically beneficial

20   concession" in the form of "lower monetary payments to class members," it is also

21   receiving a benefit in the form of nationwide litigation immunity.

22   The parties attempt to preclude any inference of collusion by pointing to the

23   involvement of a neutral mediator, but the Bluetooth court was faced with the same

24   situation, and found that "the mere presence of a neutral mediator, though a factor

25   weighing in favor of a finding of non-collusiveness, is not on its own dispositive of

26   whether the end product is a fair, adequate, and reasonable settlement agreement."  654

27   F.3d at 948.

28   In Bluetooth, the Ninth Circuit found that "[g]iven the questionable features of the

22

fee provision," the district court's approval order was required to provide a "clear explanation of why the disproportionate fee is justified and does not betray the class's interests."  654 F.3d at 949.  Because the district court did not do so, the approval order was vacated.

In this case, the court cannot explain why the disproportionate attorneys' fees are justified and do not betray the class's interests, nor can it meet its "special obligation to assure itself that the fees awarded in the agreement" are not "unreasonably high." Simply put, a proposed settlement where 93.5% of the total payout goes to those directly participating in the litigation (i.e., class counsel, the settlement administrator, and the class representatives) creates the impression that the proposed settlement has been negotiated for their benefit, at the expense of the unnamed class members.  Put another way, where 6.5% of the payout goes to the class members, and 80.2% goes to the attorneys purporting to represent those class members, the tail is clearly wagging the dog.

## CONCLUSION

For the foregoing reasons, the motion for final settlement approval and the motion for attorneys' fees are DENIED.

**IT IS SO ORDERED.**

Dated:  November 30, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge